IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

MICHAELLE D. FICKLER,

Plaintiff,

vs.

CAROLYN W. COLVIN,
Acting Commissioner of the Social
Security Administration,

Defendant.

8:11CV440

MEMORANDUM AND ORDER

This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff Michaelle D. Fickler's disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. The Court has considered the parties' filings and the administrative record. For the reasons discussed below, the Commissioner's decision is reversed and remanded for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

Fickler filed an application for disability insurance benefits in March 2009. T13, 53. Her claims were denied initially and on reconsideration. T53, 55, 63–71. Following a hearing in June 2010, the administrative law judge (ALJ) found that Fickler was not disabled as defined under 42 U.S.C. §§ 416(i) or 423(d), and therefore not entitled to disability benefits. The ALJ determined that, although Fickler suffered from several severe impairments, and could no longer perform her past relevant work, she had the residual functional capacity to perform other jobs that exist in significant numbers in the national economy. T13–21. On October 27, 2011, after reviewing additional evidence and a brief submitted by Fickler, the Appeals Council of the Social Security Administration denied Fickler's request for review of the ALJ's decision. T1–4. Fickler's complaint seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g). Filing 1.

# FACTUAL BACKGROUND

## I. Medical Records

Fickler alleged that she became disabled beginning January 4, 2005. T109. The record in this case details Fickler's life from 1998 to 2010. Although the records from 1998 through 2004 do not bear directly on her disability status, they provide context for the health issues Fickler has alleged to be disabling, and a history of her various self-reported symptoms, diagnoses, and attempts at treatment.

### A. Fickler's Work and Medical History, 1998 to early 2005

From 1998 to January 2005, Fickler worked at Tyson Foods, in a variety of positions. T137, 174. When she was not on light duty,[1] her job involved significant physical exertion. T174. Fickler began noticing aching and soreness in both hands around 1999 or 2000, and this became more significant in December 2001. T403. Over-the-counter painkillers offered little relief. T403. Then, on January 31, 2002, Fickler was in a car accident. T396. That day, she reported pain in the back of her neck and in both shoulders, and over time reported pain and numbness in various parts of her body. T397, 668, 1222, 1236. She sought medical attention, T1216, and in April 2002, she was placed on light work duty at Tyson and referred to physical therapy focusing on her wrists and carpal tunnels. T403, 573. By August 2002, Fickler was discharged from physical therapy and although she had shown some improvement, she still had discomfort in her forearms and wrists that was aggravated by work. T561.

In late August 2002, Fickler was seen by Dr. David Clough for an orthopedic evaluation, and was diagnosed with bilateral carpal tunnel syndrome, bilateral epicondylitis,[2] and left rotator cuff and biceps tendinitis. T402. Fickler reported that she had tried multiple workstation changes at her job, but with little improvement. T402. In October, she met with Dr. Lawrence M. Rubens, who concluded that further physical therapy would not help, and recommended that Fickler be permanently restricted from working

---

[1] Fickler worked on light duty for at least some portions of 2002 to 2005; it is not clear what this entailed. T169–170.

[2] Or as it is more commonly known, "tennis elbow," which refers to "chronic inflammation at the origin of the extensor muscles of the forearm from the lateral epicondyle of the humerus, as a result of unusual or repetitive strain (not necessarily from playing tennis)." *Stedman's Medical Dictionary* 573 (27th ed. 2000).

at or above shoulder level, and avoid exposure to cold working environments, which aggravated the condition. T466.

In November 2002, Fickler met with Dr. D.W. Hoehne regarding pain from the automobile accident. T436. Hoehne diagnosed her with chronic spinal pain, cervical and thoracic subluxation complexes, myalgia, brachial neuralgia, and shoulder pain with internal derangement. Instead of surgery, he recommended spinal and extremity manipulative treatment, electric muscle stimulation, ultrasound therapy, and cryotherapy. T436, 443–48. Fickler was treated for approximately 2 months, then discontinued treatment because she was not sure if her insurance would cover the treatment and she could not afford it on her own. T436. In March 2003, Fickler contacted Hoehne and noted that her symptoms were still making it difficult to work. T436. She considered returning for chiropractic treatment but decided she could not afford it. T436.

In a June 2004 "Injury/Illness Status Report" provided by Tyson, Fickler reported pain in her right fingers, back, and both shoulders. T227. In August 2004, a doctor with Tyson diagnosed her with bilateral repetitive strain injury to her shoulders. T227. From August to October 2004, Fickler underwent a number of physical therapy sessions for pain and decreased range of motion and strength in both shoulders. T233.

Fickler stopped working at Tyson after January 4, 2005. T30. At that time, she was pregnant with her third child and was near her delivery date.[3] T314, 343. Fickler later testified that she stopped working because she was experiencing a lot of back pain at work, and because she was so close to her due date, her doctor recommended that she go ahead and take maternity leave. T30. Fickler's third child was born a few weeks later. T48, 343.

Fickler testified that after the birth of her third child, she had a lot of problems. T31. Although her obstetrician-gynecologist ("OB-GYN") released her to return to work in March 2005, she was still experiencing back pain and headaches. T46, 277. The OB-GYN told her this was not an uncommon side effect of epidurals and that it should improve. T46. When her back pain did not improve, Fickler sought further treatment. T46, 277. In March 2005, Fickler underwent an MRI scan of her lumbar spine. The scan revealed "[m]inimal early disko-osteophytic[4] changes" and "[l]eft S1 nerve root diverticulum."[5] T283.

---

[3] Fickler's two older children were born in 1995 and 1999. T314.

[4] Osteophytes are more commonly known as bone spurs; when these develop on vertebrae they may impinge on nerves and cause pain. Cedars-Sinai, *Bone Spurs (Osteophytes)*, http://www.cedars-sinai.edu/Patients/Health-Conditions/Bone-Spurs-Osteophytes.aspx (last accessed March 15, 2013).

## B. Fickler's Visits to Physician's Assistant Barry Tietgen

In April 2005, Fickler met with Barry Tietgen, a physician assistant (PA-C) with the Pierce Medical Clinic, complaining of back pain and symptoms of radiculopathy. T277. She had been unable to return to work since her baby was born in January due to back pain. T277. She reported pain throughout her back, in her left lower leg, and numbness in her right toes. T277. Tietgen noted point tenderness throughout her back. He examined the MRI from March and noted it showed "nothing real dramatic. Looks like the vertebral heights are well maintained." T277.

Tietgen's impression was that Fickler had fibromyalgia. T277. He also noted that Fickler was overweight and had a deep lordosis. T277. Because she was breastfeeding at that time, he could not recommend the medications used to treat the symptoms of fibromyalgia. T277, 275. Instead, he advised her to stay physically active and work on weight reduction. Tietgen also noted that she had minimal degenerative joint disease of the spine and congenital spina bifida. T527. He recommended that she should avoid prolonged standing in stationary positions. T527. With Tietgen's approval, Fickler took leave from work to see if her condition would improve with time off and rest. T46.

Tietgen saw Fickler again in May 2005. T276. She was still reporting pain. T276. Because she was still breastfeeding, she had not started any medications for fibromyalgia. T276. Tietgen told her that she should lose weight and start an exercise program, and that this was "part of the treatment of fibromyalgia." T276. He advised her to avoid prolonged standing for 30 minutes at a time. T276.

Fickler met with Tietgen in June and July 2005 and continued to report painful symptoms. T274–75. With prolonged standing, she experienced numbness and pain in her thighs and pain in her lower back. T275. She fatigued easily. T274. Tietgen continued to recommend she stay off work. T275. He noted that her job at Tyson required her to stand for 10-hour days and operate equipment in a "chronic, repetitive" manner. T275. Tietgen again

---

[5] Nerve root diverticulum are also known as "Tarlov's perineural cysts." Richard Glenn Fessler & Laligam Sekhar, *Atlas of Neurosurgical Techniques*, 372 (Thiem 2006). "Tarlov cysts are fluid-filled sacs that most often affect nerve roots at the lower end of the spine (sacrum). Such cysts typically cause no symptoms and are found incidentally on magnetic resonance imaging (MRI) studies done for other reasons." John Atkinson, Mayo Clinic, *Tarlov Cysts: A Cause of Low Back Pain?*, http://www.mayoclinic.com/health/tarlov-cysts/AN01603 (last accessed March 15, 2013). In some cases, the cysts may expand and put pressure on nerve roots, causing pain. *Id.*

- 4 -

noted that Fickler's health issues were complicated by her weight. In July, Fickler, who was approximately 5'4", weighed 294 pounds. T274. Tietgen informed her that he would like her to lose 44 pounds as a starting point, and they reviewed proper nutrition. T274. At that point, Fickler was trying to wean her third child from nursing, but was having trouble. T274. Tietgen saw Fickler again in October 2005 for a follow-up. T273. She had still not returned to work. T273. Fickler rated her pain as 8/10 for the most part. T273. Her child was still breastfeeding, so there was little Tietgen could offer in the way of treatment. T273. He believed that she could not stand for the long periods required by her job at Tyson. T273. Tietgen referred Fickler to Dr. John Hurley, a rheumatologist. T269, 273.

Hurley evaluated Fickler in December 2005. Fickler reported constant, diffuse pain that had lasted for some time. T269. It was worsened by excessive activity and helped somewhat by rest. T269. It led to poor sleeping and stiffness in the morning that lasted several hours and sometimes all day. T269. Her weight was up approximately 15 to 20 pounds due to lack of activity. T270.

Hurley noted that she had "some difficulty getting from the chair to the examining table." T270. She had a full range of motion in the cervical spine. T270. An MRI of her back revealed arthritis. T269. A soft tissue examination revealed tenderness in many points on her back, upper buttocks, and parts of her knees; with very minimal, if any, pain in the control areas. T270. Hurley diagnosed her with fibromyalgia and osteoarthritis. T270. Hurley agreed that Fickler would have "great difficulty performing what she explained as her previous occupation at Tyson Foods." T270. Hurley also agreed that treating Fickler was "difficult" because she was still breastfeeding. T270. Around this same time, Fickler's youngest child was diagnosed with leukemia. T269. Hurley noted that because of this, the child was not taking solid foods, and Fickler was still breastfeeding. T270.

### C. Tietgen's Functional Assessments

In January 2006, Fickler was laid off for not returning to work; thereafter she was on short- and long-term disability for approximately 2 years, through 2007. T47, 170, 196. In May 2006, Tietgen completed an "Estimated Functional Abilities" form for Fickler, in connection with her disability insurance. T528. He noted that her fibromyalgia "may improve once she is able to begin treatment with medication."[6] T528. Tietgen stated

---

[6] It is not clear from the record whether Fickler was still breastfeeding at this point. On this form, Tietgen wrote that Fickler was unable to take medications "while she is breastfeeding her young son which as far as I know she continues to do." T528. It appears that Tietgen

that, in an 8-hour work day, Fickler was capable of 2–3 hours of "sedentary activity," defined as a maximum of lifting or carrying 10 pounds, walking and standing on occasion, and sitting 6 to 8 hours. T528. Tietgen also wrote that she was capable of 1–2 hours of "light activity" each workday, defined as 20 pounds maximum lifting, carrying 10-pound articles frequently, being able to do most jobs involving standing with a degree of pushing and pulling, and standing 6 to 8 hours a workday. T528. On another portion of the form, Tietgen wrote that Fickler could frequently lift 1 to 10 pounds, occasionally lift 11 to 20 pounds, and could never lift any greater weight. T529. She could never kneel or crawl, but could occasionally bend, climb stairs, reach above her shoulders, and push or pull up to 10 pounds.[7] T529. He also stated she could use both hands for simple grasping, fine manipulation, and medium dexterity, but neither for a power grip. T529.

In October 2007, Tietgen examined Fickler, to re-evaluate her fibromyalgia and to help her fill out insurance forms. T285, 526. He had not seen her since 2005. T526. Fickler reported that she had not seen him because she was focusing on caring for her son with leukemia, which often kept her at hospitals outside of Norfolk. T285. She reported weaker bilateral handgrips. T285. Fickler had a "fairly good range of motion" in her arms but could not quite extend them above her head. T285. She had positive trigger points for fibromyalgia in multiple areas and Tietgen wrote these were "quite convincing and she retracks [sic] in discomfort." T285. Fickler reported that she was sleeping poorly, would get very fatigued, and could not work at any task for any length of time without having to rest. T285. However, Tietgen noted she appeared mentally alert. T285. She also stated that "[e]ach and every step is painful to her in her feet and legs." T285.

Fickler was no longer breastfeeding, so Tietgen prescribed Elavil, diclofenac, and Flexeril. T285. He also prescribed physical therapy, and wanted her to come back in 4 weeks for a reassessment.[8] T285. After this

---

did not meet with Fickler when he filled out this form. When he saw her again in 2007, he wrote that he had not seen her since 2005. T526.

[7] There are two versions of this form, both apparently filled out by Tietgen. T529, 530. They are the same, except that one states she can occasionally push or pull 25 pounds. T530. Neither form is dated, but it is safe to assume they were filled out in connection with either the 2006 or 2007 assessment, or that one was filled out for each.

[8] Elavil (amitriptyline) is an anti-depressant, but is used in the treatment of fibromyalgia as it may produce "modest benefits with pain[.]" University of Maryland Medical Center, *Fibromyalgia - Medications*, http://www.umm.edu/patiented/articles/what_medical_treatments_fibromyalgia_000076_10.htm (last accessed March 15, 2013). Flexeril (cyclobenzaprine) is a muscle relaxant. *Id.*

meeting, Tietgen filled out another "Estimated Functional Abilities" form for Tickler, identical to the one he completed in March 2006. *Compare* T526 *with* T528. He provided the same answers as before (i.e., that Fickler was capable of 2–3 hours' sedentary activity and 1–2 hours' light activity each day). T526.

In late November 2007, Fickler found out that she was pregnant (and had been since approximately September) with her fourth child. T48. She contacted Tietgen's office and notified them she was discontinuing the medications and physical therapy, due to her pregnancy and cost concerns. T519.

### D. The December 2007 Letter from Unum

In December 2007, Tietgen received a letter from Fickler's insurance provider, Unum. T523–24. The letter summarized a telephone call between an Unum representative and Tietgen that had occurred 2 days earlier. T523.

Unum had called Tietgen to ask him to clarify his opinion on Fickler's ability to work. T523. As noted above, Tietgen provided identical opinions in May 2006 and October 2007. *See* T526, 528. The Unum representative noted that between these two assessments, in April 2007, Tietgen had reviewed and agreed with a "formal Functional Capacity Examination" from March 2007. That examination was conducted by one "Ms. Jarzynka." Jarzynka had found that Fickler had "sustainable light work capacity; [and could] occasionally lift 10-20 pounds, frequently push/pull 10 pounds and sit, stand and walk 6-8 hours per day." T523. Tietgen had apparently agreed with this assessment, although this was markedly different than the evaluations he provided in March 2006 and October 2007. T523.

The Unum representative asked Tietgen to clarify this discrepancy. According to Unum, Tietgen responded that there was "no way Ms. Fickler had sustainable work capacity at a light level" and there was "no way she was capable of working." T523. He based this assessment of her on an office examination, which included testing activities such as rapid alternating arm movements, her ability to reach overhead, and observation of bending and squatting activities. T523. Tietgen reportedly concluded that Fickler had "untreated fibromyalgia, but also noted that there are no physical deficits in this symptom[-]based condition and that having a patient remain fully active was a mainstay in treating this disorder." T523. However, Tietgen concluded that her overall condition was such that she could not return to work, and that recent attempts at treatment had been frustrated because she had

---

Diclofenac is a nonsteroidal anti-inflammatory drug (NSAID). The Merck Manual, *Diclofen ac (Systemic)*, http://www.merckmanuals.com/professional/lexicomp/diclofenac%20%28syste mic%29.html (last accessed March 15, 2013).

become pregnant again. T523–24. Tietgen signed and returned the letter, acknowledging that the Unum representative had "accurately captured the essence" of their conversation.

Unfortunately, the record contains only this letter recounting the telephone call with Tietgen. The evaluation apparently conducted by Jarzynka is not before the Court. Nor is there any evidence of what qualifications she possessed, or of the basis for her evaluation.

### E. Fickler's Application for Social Security Benefits, Records from 2008 through 2009

In June 2008, Fickler gave birth to her fourth child. T326, 328. She later testified that she nursed this child for approximately 14 months, which would have ended around August 2009. T38. Then, around October 2009, Fickler became pregnant with her fifth child. T49. The record does not show that Fickler took any steps to address her health problems during the period when she was no longer nursing and not yet pregnant.

In a "Disability Report" from April 2009, Fickler alleged disability as a result of fibromyalgia, bilateral carpal tunnel syndrome and shoulder problems, elbow pain, headaches, numbness and tingling in her arms and legs, pain in her knees, hips, wrists, back, and neck, trouble sleeping, restless legs, painful fat tumors in her back, arms, and stomach, spina bifida, and "degeneration" of her back, neck, and spine. T146–47. She reported that her wrists hurt "really bad so it's hard to do any activities for long periods of time, especially the left wrist[.]" T147. Fickler could not stand for long periods of time because her legs would go numb, tingle, and hurt. T147. Going up and down the stairs was difficult because of her knee pain, and took her some time. T147, 167. And her shoulder pain limited her ability to work above her shoulders. T147. At that time, she was not taking any non-prescription medications. T152.

Fickler completed a "Daily Activities and Symptoms Report" in May 2009. T166. In a typical day, she said she cared for her children and tried to do the dishes and laundry. She also helped her children with their homework and helped the two smaller children bathe. Doing the dishes made her hands hurt, and caused her legs to tingle and become numb after standing for a while. Doing the laundry made her shoulders hurt. She had to stop and rest frequently, and stretch and rub her muscles. T169. The pain in Fickler's hips, arms, back, knees, and head made it hard to sleep, and she was often sleep-deprived and tired. T167. It took her a long time to get tasks done. Her carpal tunnel syndrome made it difficult to grip and she often dropped things. Fickler tried to do all of the indoor chores but could not finish them by herself, and relied on her husband and children to help. T166. Her children

helped with vacuuming, sweeping, and mopping. She could not do any outside chores such as raking or mowing; her family took care of these. She would walk to her mailbox to get the mail once in a while. T167.

Fickler did not identify any difficulty caring for her own daily needs except that she had to wear loose clothing and that it was difficult to get socks on and off and to wear them all the time. T166. Cooking was difficult because it was hard to be on her feet for long periods, so her family dined out a lot, and she ate mostly simple meals, such as cereal. T166. Fickler did not do much driving, because sitting in the car too long hurt her hips. T166. When she went shopping, her husband would drop her off at the door. T166. Because her family lived in the country, a few miles from town, they tried to limit their trips into town, and her husband and children helped run errands. T167.

Fickler reported not having any hobbies, except occasionally listening to music, but she did not do that often because of frequent headaches. T167. She did not go many places, and did not participate in any social clubs or attend church. She stated that she was "not able to go for a lot of walks." She would walk around the house, and sometimes to the mailbox. Fickler stated that she did not watch much television, and when she did, it was usually while she was doing something else. T167.

In response to the question, "How long can you stand at one time?" Fickler answered that she could stand a little, but would then have to sit down, and that she had to rest a lot. T167. "I have to take breaks and do a little of this and then a little of that. My hands hurt to write a lot. My legs go numb and tingle [if I] stand to [sic] long." She wrote "I have to sit and get up and sit and get up. If I sit too long my back and neck and legs hurt. My legs, feet, arms, and hands swell up with a lot of activity." Writing hurt her wrists and elbows. T167.

Fickler described painful symptoms throughout her body, in varying kinds and degrees, as well as weakness, restless legs, dizziness, shortness of breath, fatigued wrists, and muscle spasms. T168. She explained that sometimes if someone touched her, especially on her back, posterior, or legs, it felt like she was being stabbed. Her joints felt as if they were bones rubbing together painfully. She felt "like a cripple trying to walk" sometimes from the soreness and stiffness. T168.

Fickler also filled out a "headache questionnaire" in May 2009, which described serious and debilitating headaches in detail. T158–59. Fickler did allege disability as a result of her headaches (T147) and briefly discussed her headaches at the hearing (T37–38, 42). The ALJ noted her headaches in his decision, but did not otherwise discuss them. T17. However, Fickler has not

argued this was error, and the Court will not discuss her headache symptoms in any further detail.

### F. Consultative Evaluation with Dr. Larry Birch

Fickler underwent a consultative evaluation by Dr. Larry Birch in September 2009. T367–375. She still reported the same general symptoms. T372. In his physical examination, Birch noted that Fickler had significant gynoid lymphedema,[9] as well as obesity. T373. He considered most of the swelling in her body and lower extremities to be "fairly classic lymphedema" but also noted significant abdominal obesity. T373. Birch noted she had some difficulty in demonstrating "really agile movement" but that she could walk across the examination room without assistance. T374. Squatting was difficult due to the lymphedema, but overall her range of motion was "extremely good for everything considered." T374. She was able to get on and off the examination table, and turn from supine to prone and sit up (with some difficulty). Throughout her body, her range of motion was "somewhat slightly limited due to her obesity caused by her lymphedema in the lower extremities[.]" T369–370, 374.

Birch found her upper extremities "entirely normal." T374. He found that Fickler had limitations on quick and alternating movement, that lifting and bending would be somewhat limited, and that squatting would be difficult. T374. Birch noted that she claimed to suffer from congenital spina bifida, but noted no neurological issues. T374–75. He could not explain her shoulder and elbow pain, or her headaches. T375. Birch concluded:

> Unfortunately her lymphedema has progressed up to where she has gained over 120 pounds since her early adult life and with the amount of lymphedema and tissue, the distortion caused [to] the lower extremities is probably beyond treatment at this time and does cause her some limitations as would be imposed by agile movements using the lower extremities.

T374. Birch did not describe any more specific limitations on Fickler's ability to work.

---

[9] Gynoid (gynecoid) refers to the distribution of body fat chiefly in the region of the hips and thighs. Merriam-Webster Online Dictionary, *s.v.* "Gynecoid", http://www.merriam-webster.com/dictionary/gynecoid (last accessed March 15, 2013). Lymphedema is defined as "[s]welling (especially in subcutaneous tissues) as a result of obstruction of lymphatic vessels or lymph nodes and the accumulation of large amounts of lymph in the affected region." *Stedman's Medical Dictionary* 1040 (27th ed. 2000).

## G. Reports of State Agency Medical Consultants, Drs. Jerry Reed and James J. Bane

In September 2009, a state agency medical consultant, Dr. Jerry Reed, conducted a physical residual functional capacity assessment of Fickler. T382. This was a records review; Reed did not actually examine Fickler. He found that Fickler could frequently lift or carry 10 pounds and that her ability to push or pull (including the operation of hand or foot controls) was limited to an occasional basis due to her severe lymphedema.[10] T383. Reed stated that Fickler could stand and/or walk (with normal breaks) for a total of "at least 2 hours in an 8-hour work day[,] 3-5 hours a day." T383. He found that she could sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; he did not check the box stating that she must periodically alternate sitting and standing to relieve pain or discomfort. T383. She could occasionally climb stairs, balance, stoop, and kneel, but could never crouch or crawl. T384. He found no manipulative limitations in her hands (in other words, she could reach in all directions, including overhead, and do gross and fine manipulation with her hands and fingers). T385. He also found that she retained the ability to perform the full range of "'sedentary'" exertion. T384. Reed concluded that Fickler's complaints of disabling pain were partially credible, given the objective medical evidence, and her treatment history and activity level. T387. Although she complained of significant joint pain, she underwent minimal treatment and took no strong pain medications.[11] T387.

In November 2009, a second state agency medical consultant, Dr. James J. Bane, reviewed Reed's assessment and summarily stated that he agreed with Reed's findings. T391. Bane noted that the only change since Reed's assessment was that Fickler had become pregnant. T391.

## H. Medical Records, 2009–10

In November 2009, Fickler filled out a new disability report. She stated that the pain in her knees, hips, and left wrist had worsened since April 2009, and she was having more trouble sleeping. T201. She also reported shooting pain in her wrists, her arms and hands falling asleep, and tingling foot and leg pain. T201. Going up and down stairs hurt her knees "really

---

[10] The assessment defined "frequently" as occurring one-third to two-thirds of an 8-hour work day; and "occasionally" as occurring from very little to up to one-third of the day. T382.

[11] Reed also stated, incorrectly, that Fickler was "able to spend a lot of time watching TV." T387. That finding is contradicted by the record. The only evidence on Fickler's TV habits came from her, and statements from her friends and family—and these uniformly reveal that Fickler was either too busy taking care of children to watch TV or did not enjoy watching it because of headaches. *See* T161, 167, 183, 187, 191.

bad," and she had pain her back, shoulders, neck, and feet, and lots of swelling. T201. She had to move up steps one at a time. T203.

Although Fickler claimed that her condition had worsened, her report does not reveal any ways it affected her differently. In fact, she stated that her daily activities had not changed since the report in April 2009. T203. Her conditions did not affect her ability to care for her personal needs except that the swelling made it hard to wear socks and to get socks and shoes on and off. T203. And despite her allegedly worsening symptoms, Fickler had not visited a medical provider, and she was still not taking any medications. T201–03. Another disability report in January 2010 suggested some changes in Fickler's symptoms, but no changes to her ability to care for herself or her daily activities, other than difficulty getting in and out of the shower. T214-218. She also reported that she was taking Tylenol. T217.

Fickler met with Dr. Daniel Wik, a chiropractic and medical doctor, in February 2010. T1244. At that time she was 20 weeks pregnant. T1244. She reported the same symptoms as previously, and difficulty putting socks and shoes on; that it was hard to do dishes, laundry, and cleaning, and that she was tired and weak in her arms with lots of swelling. T1244.

Wik conducted a comprehensive lumbar examination of Fickler, with mixed results. Various tests were positive for pain at the L5 level. T1244. However, during muscle strength testing, Fickler had "some amount of incooperation [sic] and needed to have extra encouragement." T1244. In order to obtain maximum effort, Wik had to test each muscle individually. T1244. Touching Fickler's sacroiliac joints for one test revealed much greater pain than would be expected. T1244. Palpation of the vertebral and paravertebral structures of her lumbar spine produced extreme pain and muscle spasms, but Wik also noted that there was "extreme sensitivity to a very minimal amount of pressure." T1244. Despite this, Fickler was

> observed rolling on the examination table from prone to supine with no signs or symptoms of protective antalgia. Patient bends forward, backward and in very awkward and precarious positions taking care of her children who are also present in the examination room and when performing these types of functions, she seems to not have any type of antalgic protective mechanisms.

T1244.

Wik diagnosed Fickler with peripheral neuropathy/carpal tunnel syndrome, chronic low back and cervical pain, multi-joint pain, and chronic pain myofacial syndrome with fibromyalgia. T1245. He also noted that

although Fickler wished to apply for disability, his opinion could not substantiate a disability claim as there were "too many pieces of information that are missing." T1245. He prescribed Cymbalta and Meloxicam,[12] but noted that Fickler's OB-GYN might veto the use of such medications as harmful to Fickler's baby. T1245. And indeed, her OB-GYN did advise against taking these medications while pregnant. T221, 1257.

On August 9, 2010,[13] Fickler reported headaches that had been getting worse over the last month. T1252. She described headaches lasting all day, of moderate to severe intensity. T1252. Lying in a dark room and taking extra-strength Tylenol helped. T1252. Later in August, Fickler met with a podiatrist, Dr. Robert Colligan, regarding pain in her feet. T1257. He noted multiple warts and prescribed treatment accordingly. He also noted that she had lymphedema and recommended compression stockings and boots, massage, and elevation. T1257.

## II. Statements by Fickler's Family and Friends

Fickler also submitted statements by her husband, aunt, and two friends. All were written in either May or June 2009. Her husband's report described Fickler's daily activities as fairly limited. He stated that the whole family helped in preparing meals, and they dined out. T161. He did most of the shopping, but sometimes he would drive Fickler to the store, and their children would help with the shopping. Fickler generally stayed home and did not have a lot of hobbies. She did not watch TV much because of headaches and pain in her eyes. T161. On an average day, Fickler would help get the two school-aged children ready to catch the bus, and would do some chores, but usually needed help from her husband or children. T163. She would often lie down in the bedroom as a result of headaches. T163.

The report from Fickler's aunt, Maralee Hobbs, added little new. She had known Fickler since 1986 and lived close by. T170, 183. Hobbs said that Fickler walked as needed to keep up with her two little boys, and some days it was hard just to do this. T183. According to her, it was hard for Fickler to

---

[12] Cymbalta (duloxetine hydrochloride) is used to treat, among other things, fibromyalgia. *Physicians' Desk Reference* 1759 (65th ed. 2011). Meloxicam is a NSAID. The Merck Manual, *Meloxicam*, http://www.merckmanuals.com/professional/lexicomp/meloxicam.html (last accessed March 15, 2013).

[13] Fickler must prove that she was disabled before the expiration of her insured status (her "date last insured"), which was in June 2010 (T13). *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). Although these medical records were generated after that point, they are relevant to the extent they reflect Fickler's condition during the period she was eligible for disability benefits. *Id.*; *see also United States v. Bergmann*, 207 F.3d 1065, 1069–70 (8th Cir. 2000).

- 13 -

keep up with the housework and laundry, and the children did not help much. T183. Hobbs also said that Fickler was a "full time mom," but that she was in constant pain and had difficulty keeping up with her housework. T184–85. But she also attributed this, in part, to the difficulty in balancing the chores with keeping up with two small children. T185. Hobbs also reported that Fickler's husband and boys "do not help her much at all." T185. The other statements, from Fickler's two friends, were generally consistent with this account, and provided little additional information. T186-194.

### III. Hearing Testimony

At the time of the hearing, Fickler was 37 years old and had four children, ages 15, 11, 5, and 2. T30. She was also 8 months pregnant. T30. She was approximately 5'4" and weighed 315 pounds; at her first prenatal visit, she had weighed 300 pounds. T31.

Fickler testified regarding her symptoms; and this generally mirrored the symptoms discussed above. T31–32. She explained that she had dealt with these symptoms for years, that they had continued to worsen, and that they were unrelated to her pregnancies. T32. On a scale of 0 to 10 (0 being no pain, and 10 excruciating), Fickler described pain on most days of about 8. T35. She said that the level of pain varied with the activities she tried and how well she had slept; some days were not bad and some days she hurt so much she could not do anything. T35. She stated that her fibromyalgia caused pain throughout her body, especially in her knees, shoulders, elbows, and legs. T41–42. Fickler briefly mentioned her lymphedema, stating that it caused swelling. T42.

Fickler acknowledged she had not had undergone any tests to determine the severity of her carpal tunnel syndrome since 2002. T33. She said that some days her symptoms were the same as in 2002, and some days they were worse. T44–45. But when asked, Fickler was unable to provide any reason to believe that the problem had worsened since then. T33–34. The ALJ commented that Fickler had refused surgery for her carpal tunnel syndrome because it was not severe enough. T32. Fickler responded that she had not declined surgery, rather, her doctors had not recommended it. T32.

Fickler testified that she was limited in her ability to bend, sit, or stand for "long periods." T34. Later, when asked how long she could sit, she clarified that she had to frequently alternate between sitting and standing. T36. The duration depended on how she was doing; sometimes she could sit for 10 minutes, sometimes for an hour. T36. She stated that being seated at the hearing was causing her hips to hurt, numbness and tingling down her legs, and causing her hands to fall asleep. T36. Standing was similar: she could sometimes stand for 5 or 10 minutes while washing dishes, then she

- 14 -

would have to sit down. T36. Fickler testified that she was able to walk throughout her house as she needed, but could not go up and down the stairs much. T36. She generally did not leave the house, and could not walk "really long distances." T36.

Fickler estimated that she could lift 15 to 20 pounds on a regular basis; and stated that her ability to lift depended on the pain she was experiencing on a given day. T37. Fickler testified she was able to lift her 2-year-old. T33. She estimated that he weighed between 20 and 25 pounds, and that she had to lift him 2 to 3 times a day. T45. She could lift him to her waist, but did not think she could lift him higher without pain. T45.

Fickler testified briefly regarding her daily activities. Because her husband worked full time, usually during the day, she was the primary caregiver for the two younger children (with the older children at school). T43. Fickler stated that her husband did most of the shopping; but that she could drive herself to appointments or run errands when she needed to, although she often had to stop and rest. T37.

## SEQUENTIAL ANALYSIS AND ALJ FINDINGS

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4).

### I. Step One

At the first step, the claimant has the burden to establish that she has not engaged in substantial gainful activity since her alleged disability onset date. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006); 20 C.F.R. § 404.1520(a)(4)(i). If the claimant has engaged in substantial gainful activity, the claimant will be found not to be disabled; otherwise, the analysis proceeds to step two. *Gonzales*, 465 F.3d at 894; § 404.1520(a)(4)(i).

In this case, the ALJ found that Fickler had not engaged in substantial gainful activity since her alleged disability onset date, and that finding is not disputed on appeal. T15.

### II. Steps Two and Three

At the second step, the claimant has the burden to prove she has a "medically determinable physical or mental impairment" or combination of impairments that is "severe[,]" 20 C.F.R. § 404.1520(a)(4)(ii), in that it "significantly limits [her] physical or mental ability to perform basic work activities." *Gonzales*, 465 F.3d at 894; *see also, Kirby v. Astrue*, 500 F.3d 705, 707–08 (8th Cir. 2007). Next, "at the third step, [if] the claimant shows that [her] impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically

found disabled and is entitled to benefits." *Gonzales*, 465 F.3d at 894; § 404.1520(a)(4)(iii). Otherwise, the analysis proceeds.

In this case, at step two, the ALJ found that Fickler had several severe impairments: fibromyalgia, obesity, low back pain, and carpal tunnel syndrome (peripheral neuropathy). T15. At step three, however, the ALJ found that Fickler did not have an impairment or combination of impairments that met or medically equaled a listed impairment. T15–16.

The ALJ first considered Fickler's obesity. Although obesity does not correspond to any listed impairment, the ALJ must consider the effects of obesity, alone and in combination with other medically determinable impairments, and determine whether it meets or equals a listed impairment. Social Security Ruling (SSR) 02–1p: Policy Interpretation Ruling: Titles II And XVI: Evaluation of Obesity (2002). Here, the ALJ found that Fickler's obesity exacerbated her other impairments, but failed to reach disabling severity. T16. The ALJ further found that Fickler's fibromyalgia, carpal tunnel syndrome, and lower back pain failed to reach listing-level severity. T16. Fickler does not object to any of these findings. She does, however, claim that the ALJ erred by failing to consider whether her lymphedema met or equaled one of several listed impairments. This will be discussed in detail below.

### III. Residual Functional Capacity

Before moving to step four, the ALJ must determine the claimant's residual functional capacity (RFC), which is then used at steps four and five. 20 C.F.R. § 404.1520(a)(4). Residual functional capacity is defined as the most a claimant can still do, despite the physical and mental limitations that affect what the claimant can do in a work setting. *Gonzales*, 465 F.3d at 894 n.3; § 404.1545. To determine a claimant's RFC, the ALJ must consider the impact of all the claimant's medically determinable impairments, even those previously found to not be severe, and their related symptoms, including pain. §§ 404.1529(d)(4) and 404.1545(a)(1) and (2). This requires a review of "all relevant evidence" in the case record. § 404.1545(a). The ALJ is responsible for developing the claimant's complete medical history, § 404.1545(a)(3), and bears the primary responsibility for making the RFC determination. *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011). However, "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

A special procedure governs how the ALJ evaluates a claimant's symptoms. The ALJ first considers whether the claimant suffers from "medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms." 20 C.F.R. § 404.1529(a) to (c)(1). A

medically determinable impairment must be demonstrated by medical signs or laboratory evidence. § 404.1529(b). If this step is satisfied, the ALJ then evaluates the intensity and persistence of the claimant's symptoms to determine how they limit the claimant's ability to work. § 404.1529(c)(1). This again requires the ALJ to review all available evidence, including statements by the claimant, "objective medical evidence,"[14] and "other evidence."[15] § 404.1529(c)(1) to (3).

The ALJ considers the claimant's statements about "the intensity, persistence, and limiting effects of [her] symptoms," and evaluates them "in relation to the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). Ultimately, symptoms will be determined to diminish the claimant's capacity for basic work activities, and thus impact the claimant's RFC, "to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*; § 404.1529(d)(4). In assessing the credibility of a claimant's subjective testimony regarding his or her alleged symptoms, the ALJ must weigh a number of factors. *See, Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009); § 404.1529(c)(3)(i–vii).[16] When deciding how much weight to afford the opinions of treating sources and other medical opinions regarding a claimant's impairments or symptoms, the ALJ considers the factors set forth in 20 C.F.R. § 404.1527.

The ALJ found that Fickler had the RFC to perform "light work" as defined in 20 C.F.R. § 404.1567(b), with the following modifications: Fickler could lift 20 pounds occasionally and 10 pounds frequently; sit for 6 of 8 hours and stand and/or walk for 6 of 8 hours with a sit/stand option. T16. Additionally, she had occasional postural limitations; constant and frequent use of both hands; and could never climb ladders, ropes, or scaffolds. T16. In reaching this conclusion, the ALJ found that Fickler's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity,

---

[14] 20 C.F.R. §§ 404.1529(c)(2) and 404.1528(b) and (c).

[15] "Other evidence" includes information provided by the claimant, treating and non-treating sources, and other persons. See 20 C.F.R. § 404.1529(a)(1), and the sections referred to therein, as well as § 404.1529(c)(3).

[16] In assessing a claimant's credibility, the ALJ should consider the *Polaski* factors: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Moore,* 572 F.3d at 524; *see also Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984).

persistence and limiting effects of these symptoms are not credible to the extent" they were inconsistent with the ALJ's determination of Fickler's RFC. T17.

The ALJ found several reasons to doubt Fickler's testimony as to the severity of her symptoms. First, she had not taken any medicine other than Tylenol for her supposedly debilitating pain. T17. The ALJ acknowledged that because Fickler had been nursing or pregnant for most of the relevant time frame, it was not known whether the medicines prescribed by Tietgen or Wik would have helped. T17. But Tietgen had expressed some hope that they would help. T17, T528. And although Tietgen had consistently recommended that Fickler exercise, eat right, and lose weight, as part of the treatment for fibromyalgia, there is no evidence Fickler even attempted any of these. T17–18. All of these could have been done without risking harm to her children. T17. Fickler's weight had remained essentially the same since her alleged onset date. After the birth of her third child in January 2005, she weighed approximately 295 pounds; at the hearing, she was 8 months pregnant and weighed 315 pounds. T18.

The ALJ next found that Fickler's daily activities were inconsistent with her allegations of disabling pain and fatigue. T18. At least since leaving work in 2005, she had been the primary caregiver for her third child, and since 2008, her fourth child. T18. This included taking care of her third child's special medical needs. T18. The ALJ further found that Fickler may have been downplaying the extent of her daily activities, and that her reports were inconsistent with those of third parties. T18. There was also evidence, the ALJ found, that Fickler had stopped working for reasons not related to her alleged disability, and exaggerated her symptoms in an effort to receive benefits and continue to remain at home with her children. T18. And although Fickler was diagnosed with mild carpal tunnel syndrome in 2002, she continued working for 3 years even though she later alleged that she had trouble grasping and often dropped things. T19. Her allegations were also contradicted by Birch's examination, which showed her upper extremities to be entirely normal. T19.

The ALJ next discussed the opinions of Tietgen and the consulting physicians Reed and Bane. T18–19. He noted that Tietgen had managed Fickler's care sporadically for approximately 5 years, but had had trouble treating her because she was either pregnant or breastfeeding. T19. The ALJ then cited the December 2007 letter from Unum to Tietgen, where Tietgen agreed that Fickler had a "sustainable light work capacity" and could sit, stand, and walk for 6–8 hours per day. T19. The ALJ found that Tietgen's

opinion was entitled to "some consideration" and supported his RFC assessment.[17]

After noting generally that consulting physicians do not examine the claimant and thus are not entitled to as much weight as treating or examining physicians, the ALJ found that the opinions of Reed and Bane were entitled to "some weight" because they were consistent with the record. T19. And the ALJ specifically noted that Reed found Fickler's complaints to be disproportionate to what should have been expected, given her medical history and activity level. T19.

Finally, the ALJ briefly discussed the statements provided by Fickler's family and friends. T19. The ALJ noted that the statements generally mirrored Fickler's allegations (which he found to be not credible) but also exposed some inconsistencies. T19. Ultimately, the ALJ found their statements did not establish Fickler to be disabled, and that their opinions were entitled to little weight as they were lay-persons and could not be considered disinterested. T19.

As discussed in greater detail below, Fickler argues that the ALJ committed numerous errors in evaluating the opinions of Tietgen and the consulting physicians, in evaluating her credibility, and in deciding the weight to assign to the statements of her family and friends.

## IV. Steps Four and Five

At step four, the claimant has the burden to prove that she lacks the RFC to perform her past relevant work. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still do her past relevant work, she will be found to be not disabled, otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform. *Gonzales*, 465 F.3d at 894; § 404.1520(a)(4)(v).

In this case, at step four, the ALJ found that Fickler was unable to perform any past relevant work. T20. But the ALJ found, based on the testimony of the vocational expert, that there were jobs that existed in significant numbers in the national economy that Fickler could perform. T20–21. So, the ALJ concluded that Fickler was not under a disability, and denied her claim for benefits.

---

[17] It is not clear if, by Tietgen's "opinion," the ALJ was referring collectively to Tietgen's opinions, or simply to the Unum letter, which was the only functional assessment discussed in detail.

## STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id.* The Court must consider evidence that both supports and detracts from the ALJ's decision, but will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id.* The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). And the Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

Where the claimant submits evidence to the Appeals Council that was not previously submitted to the ALJ, the new evidence becomes part of the administrative record before the Court. *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992). If, as here, the Appeals Council considered the new evidence but declined to review the ALJ's decision, the Court does not evaluate the Council's decision to deny review, but determines whether the record as a whole, including the new evidence, supports the ALJ's determination. *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000); *see also Van Vickle v. Astrue*, 539 F.3d 825, 829 n.2 (8th Cir. 2008). The Court must decide how the ALJ would have weighed the new evidence had it existed at the initial hearing. *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000). But the general rule still applies: even if the new evidence is substantial and supports a contrary decision, the Court may not reverse the ALJ's decision if it is supported by substantial evidence. *Id.*

## ANALYSIS

Fickler argues that the ALJ committed a number of errors in finding she was not disabled. Many of Fickler's arguments are without merit, but two errors require remand. Both relate to the ALJ's determination of Fickler's RFC.

- 20 -

## I. Whether Fickler's Lymphedema Was a Severe Impairment and Whether It Met or Equaled a Listed Impairment

Fickler first argues that the ALJ erred in failing to consider whether her lymphedema was a severe impairment at step two, and then again at step three in failing to find whether it met or equaled a listed impairment. But "[d]eciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even *one* severe impairment." *Arnett v. Astrue,* 676 F.3d 586, 591 (7th Cir. 2012). Here, the ALJ found that several of Fickler's impairments were severe, and proceeded on to step three. So, any error at step two was—standing alone—harmless. *See, id.*; *Carpenter v. Astrue,* 537 F.3d 1264, 1265–66 (10th Cir. 2008). Assuming there was error, it could only have prejudiced Fickler at step three or in determining her RFC. The Court has reviewed the record and is not convinced that Fickler met her burden of showing her lymphedema met a listed impairment. So, any error at step three was also harmless. But as the Court explains in part II, below, the ALJ erred in failing to explain whether Fickler's lymphedema impacted her RFC, and that error was not harmless. Before turning to Fickler's RFC, the Court will briefly explain why any error at step three was harmless.

There is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record. *Boettcher,* 652 F.3d at 863. Here, the ALJ concluded broadly that none of claimant's impairments, alone or in combination, met or medically equaled a listed impairment. T15. However, the ALJ's opinion contains no mention of Fickler's lymphedema, nor the attendant swelling it caused. Therefore, the Court cannot tell if the ALJ actually considered Fickler's lymphedema. Fickler argues that this was prejudicial error, because her lymphedema made it difficult to walk and climb stairs, and because she may have met or equaled one of several listed impairments.

Social Security regulations detail how ALJs are to evaluate claims of lymphedema at step three:

> Lymphedema does not meet the requirements of 4.11, although it may medically equal the severity of that listing. We will evaluate lymphedema by considering whether the underlying cause meets or medically equals any listing or whether the lymphedema medically equals a cardiovascular listing, such as 4.11, or a musculoskeletal listing, such as 1.02A or 1.03. If no listing is met or medically equaled, we will evaluate any functional limitations imposed by your lymphedema when we assess your residual functional capacity.

- 21 -

20 C.F.R. Part 404, Subpart P, Appx. 1, § 4.00.G.4. Fickler argues that the ALJ should have considered whether her lymphedema met or equaled the listings for §§ 4.11, 1.02A, and 1.03. The Court finds that any error in this regard was harmless, as the evidence shows Fickler did not meet or equal any of these listings.

Listing 4.11 is easily dismissed. It requires "[c]hronic venous insufficiency of a lower extremity with incompetency or obstruction of the deep venous system" and one of two other conditions.[18] 20 C.F.R. Part 404, Subpart P, Appx. 1, § 4.11. The first is "extensive brawny edema" which Fickler did not have. § 4.11.A.3; 4.00G3 (defining brawny edema). The second is "[s]uperficial varicosities, stasis dermatitis, and either recurrent <u>ulceration</u> or persistent ulceration that has not healed following at least 3 months of prescribed treatment." § 4.11.B (emphasis supplied). There is no record Fickler suffered from any ulceration. Listing 1.03 is also entirely inapplicable. It requires reconstructive surgery or surgical arthrodesis, and Fickler has never had either. § 1.03.

Listing 1.02A is more challenging. Listing 1.02 applies to:

Major dysfunction of a joint(s) (due to any cause): Characterized by [1] gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis[19], instability) and [2] chronic joint pain and stiffness with [3] signs of limitation of motion or other abnormal motion of the affected joint(s), and [4] findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b . . . .

---

[18] Venous insufficiency is "a condition in which the flow of blood through the veins is impaired." Cleveland Clinic, *Diseases and Conditions: Venous Insufficiency*, http://my.clevelandclinic.org/disorders/venous_insufficiency/hic_venous_insufficiency.aspx (last accessed March 15, 2013). The condition occurs "when forward flow through the veins is obstructed, as in the case of a blood clot, or if there is backward leakage of blood flow through damaged valves." *Id.*

[19] Ankylosis refers to the "[s]tiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint." *Stedman's Medical Dictionary* 90 (27th ed. 2000).

*20 C.F.R. Part 404, Subpart P, Appx. 1, § 1.02.*

Even if Fickler had some minor limits on her range of motion, and even if the Court assumes that swelling alone should also be considered a "gross anatomical deformity," Fickler has not pointed to any, nor has the Court found, "appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis" of her affected joints. *Id.*

Nor does the record show that Fickler's lymphedema resulted in an "inability to ambulate effectively." *Id.* This is defined generally as

> an <u>extreme</u> limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is <u>defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities</u>. . . .

> > (2) To ambulate effectively, individuals must be capable of <u>sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living</u>. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, <u>and the inability to climb a few steps at a reasonable pace with the use of a single hand rail</u>. <u>The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.</u>

*20 C.F.R. Part 404, Subpart P, Appx. 1, § 1.00.B.2.b(1)–(2)* (emphasis supplied).

Beginning with the general definition, Fickler has never needed to use a cane or assistive device. And while she had difficulty walking, it did not unduly interfere with her ability to carry out her activities of daily living. She could not walk "really long distances." T36. But more is required to find an inability to ambulate effectively. Fickler was able to drive herself and run

errands as needed, and keep up with her two young children every day. Birch found that Fickler's lymphedema imposed only difficulty with "agile movements." T374. Fickler had difficulty with stairs, avoided them when she could, and had to go up stairs one at a time. T32, 36 203. But there is no evidence she was unable to "climb a few steps at a reasonable pace with the use of a single hand rail." 20 C.F.R. Part 404, Subpart P, Appx. 1, § 1.00.B.2.b(2). In short, there is no evidence Fickler was unable to ambulate effectively. Fickler has not shown that she met any of the above listed impairments. Nor has she argued that the ALJ should have considered other listed impairments. Therefore, any error at step three was harmless.

## II. Consideration of Lymphedema in Fickler's RFC

But Fickler next argues that the ALJ erred in failing to consider the impact of her lymphedema on her RFC. As noted above, the ALJ's opinion contains no mention of Fickler's lymphedema. Nor does the opinion mention the attendant swelling or fluid retention. Fickler argues that this shows the ALJ failed to fully and fairly develop the record with regard to the impact of her lymphedema.

The ALJ may or may not have satisfied his duty to develop the record—but the Court cannot tell. Again, the real problem stems from the fact that, after careful review of the opinion, it is not clear to this Court whether the ALJ considered the impact of Fickler's lymphedema at all. And unlike any omissions at steps two and three, the Court cannot say this error was harmless. To determine a claimant's RFC, the ALJ must consider the impact of all the claimant's medically determinable impairments, even those previously found to not be severe, and their related symptoms, including pain. 20 C.F.R. §§ 404.1529(d)(4) and 404.1545(a)(1) and (2). The ALJ was obligated to consider Fickler's lymphedema and the swelling it caused. Although Fickler's lymphedema may not have been "severe" for purposes of step two, nor met a listed impairment at step three, there is evidence it caused significant limitations on her ability to work.

The error here was primarily grounded in the ALJ's duty to explain his decision; there may not necessarily have been a violation of the duty to develop the record. There is no bright line rule to determine when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis. *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008). While the ALJ must fairly and fully develop the record, the ALJ is not obligated to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability. *Id.* The claimant is in the best position to alert the ALJ to any impairments, and bears the burden of presenting the strongest case possible.

*Id.* at 637. On the other hand, Social Security proceedings are inquisitorial rather than adversarial, and it is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits. *Sims v. Apfel,* 530 U.S. 103, 110–11 (2000). And at some point, references in the record to a potentially disabling condition will put the ALJ on notice and trigger the duty to develop the record, even if the claimant has not raised the issue. *Mouser,* 545 F.3d at 639.

In some respects, the fact that the ALJ did not discuss Fickler's lymphedema is not totally unexpected. Fickler did not list lymphedema as a disabling condition in her initial disability report. *See* T147. Of course, this report was filled out 5 months before she was first diagnosed with lymphedema, so the omission is understandable. T147, 367–75. But at the hearing, Fickler was well aware of this condition, yet her testimony concentrated almost entirely on other health conditions. Fickler mentioned lymphedema once, briefly stating that she experienced a lot of swelling. T41–42. When the ALJ asked her if she could describe any symptoms other than pain from fibromyalgia, or anything else that affected her ability to work, she did not mention the lymphedema or swelling. T42.

In a related line of cases, courts have held that an ALJ's failure to discuss the claimant's obesity was harmless error where the claimant did not raise the issue and no doctors imposed additional limitations as a result of the obesity. *See Anderson v. Barnhart,* 344 F.3d 809, 814 (8th Cir. 2003); *see also Forte v. Barnhart,* 377 F.3d 892, 896–97 (8th Cir. 2004). A similar omission was held harmless in *Skarbek v. Barnhart,* 390 F.3d 500 (7th Cir. 2004). In *Skarbek,* the record contained sufficient references to the claimant's obesity to alert the ALJ to the impairment, even though the claimant had not raised it as an issue. *Skarbek,* 390 F.3d at 504. But the ALJ's failure to mention obesity was harmless, because the ALJ adopted the limitations suggested by doctors who were aware of the claimant's obesity, and the claimant did not specify how his obesity further impaired his ability to work. *Id.*; *see also Rutherford v. Barnhart,* 399 F.3d 546, 552–53 (3d Cir. 2005) (adopting *Skarbek* and reasoning that because the claimant's obesity was "obvious," her doctors must have been aware of it, and the ALJ's adoption of those doctors' conclusions constituted "a satisfactory if indirect consideration of that condition").

But this case differs from *Anderson* and *Skarbek* in key aspects. In *Anderson,* the ALJ at least noted the claimant's obesity in the decision. 344 F.3d at 814. And in *Anderson,* the claimant *never* alleged any limitations resulting from his obesity. *Id.* Fickler testified regarding her lymphedema and the swelling it caused, yet the ALJ's opinion is entirely silent on both. And unlike *Skarbek,* there was at least some evidence of additional

- 25 -

impairments caused by Fickler's lymphedema that the ALJ did not adopt. The consulting physicians found that Fickler's lymphedema limited her to occasional pushing or pulling with the upper and lower extremities (including the operation of hand and/or foot controls); limited her to *never* crouching or crawling; and imposed certain environmental limitations, such as avoiding concentrated exposure to noise, vibration, fumes, odors, dusts, gases, poor ventilation, and extreme cold; and cautioned her to avoid even moderate exposure to humidity and extreme heat. T383–86, 391. The ALJ did not adopt or discuss these impairments.

The Court finds that the references in the record, and Fickler's testimony, were sufficient to alert the ALJ to the presence of her lymphedema. The Court cannot determine, however, if the ALJ considered and rejected additional impairments related to Fickler's lymphedema, or may have overlooked the matter. The ALJ was required to "minimally articulate his reasons for crediting or rejecting evidence of disability." *Ingram v. Chater*, 107 F.3d 598, 601 (8th Cir. 1997). Without some way to tell whether the ALJ considered Fickler's lymphedema, the Court cannot fulfill its duty to provide meaningful review. *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 248 n.5 (6th Cir. 2007). Therefore, the Court cannot say any error at this stage was harmless, and this case must be remanded.

### III. Evaluating Tietgen's Opinions

Fickler advances three arguments for why the ALJ did not properly evaluate Tietgen's opinions. The first two are without merit and quickly disposed of, but Fickler's third argument points to an omission in the ALJ's opinion that also requires remand. Fickler first argues that the ALJ failed to mention several of Tietgen's reports in his opinion, and therefore it should be assumed he failed to consider the reports. Filing 17 at 18–20. Specifically, she claims the ALJ failed to discuss a report from April 2005, the functional assessment from May 2006, and the re-evaluation and functional assessment from October 2007. T277, 285, 526–31. This argument is contradicted by the ALJ's opinion. The ALJ specifically cited and discussed the April 2005 report (T17–19, discussing "Exhibit 3F"), and quoted from the May 2006 assessment (T19 (quoting Exhibit 19F)). The ALJ did not specifically cite to the October 2007 visit and assessment, but he did cite to the Social Security exhibit (19F) containing the report. While the ALJ is required to fully and fairly develop the record, he is not required to discuss every piece of evidence submitted. *Wildman v. Astrue,* 596 F.3d 959, 966 (8th Cir. 2010). Nor can the Court assume that because the ALJ did not cite a specific piece of evidence, he failed to consider it. *Id.*

- 26 -

Fickler next argues that the ALJ failed to explain what weight he gave to Tietgen's opinions. It is true that the ALJ's explanation was succinct: he found that Tietgen's opinion was entitled to "some consideration" and cited 20 C.F.R. § 404.1513(d) and SSR 06-03p.[20] But the problem with the ALJ's opinion is not that he gave only a brief explanation of his decision to afford Tietgen's opinion only some weight. Nor is the phrase "some consideration" meaningless, as Fickler argues. It tells the Court that the ALJ gave Tietgen's opinion something less than controlling weight, and that these opinions were consistent with some, but not all, of the evidence of record. The Court will not remand because of an "arguable deficiency in opinion-writing" where that deficiency had no bearing on the outcome. Buckner, 646 F.3d at 559. The problem with the ALJ's consideration of Tietgen's reports lies elsewhere.

Fickler's final, and meritorious, argument is that the ALJ erred by relying upon the December 2007 letter from Unum, signed by Tietgen (the "Unum letter"), as evidence that Fickler had "sustainable light work capacity" and could occasionally lift 10–20 pounds, frequently push and pull 10 pounds, and sit, stand, and walk for 6–8 hours each day. See T19, 523. And it is here that the ALJ's terse explanation is more problematic. Fickler argues that the Unum letter lacked sufficient indicia of reliability to be credited, and that the ALJ failed to resolve the conflict between this letter and Tietgen's other opinions, which placed greater restrictions on Fickler's ability to work.

Leaving aside the question of reliability,[21] there is a more substantial issue with the ALJ's reliance on the Unum letter as substantive evidence of Fickler's condition or ability to work. The record does not disclose what, if any basis, underlay Tietgen's supposed opinion, e.g., that Fickler had sustainable light work capacity and could sit, stand, and walk for 6–8 hours. At most, the Unum letter established that at one point (April 2007), Tietgen supposedly agreed with the above assessment, which was the result of a "Functional Capacity Examination" performed by a "Ms. Jarzynka" on behalf of Unum. T523. The record does not reveal who Jarzynka was, what her qualifications were, or how she arrived at her opinion.

---

[20] As discussed below, § 404.1513(d) and SSR 06-03p detail how ALJs should weigh opinions from "other sources" such as physician's assistants.

[21] The Social Security Act does not preclude hearsay evidence, and the ALJ's proceedings are not governed by the Federal Rules of Evidence. McClees v. Sullivan, 879 F.2d 451, 453 & n.2 (8th Cir. 1989). But hearsay evidence must have some indicia of reliability such that it is "sufficiently convincing to a reasonable mind." Id. at 453. The Court does not reach the separate question whether the Unum letter met this standard.

Nor is it clear why Tietgen allegedly agreed with Jarzynka's assessment in April 2007. And assuming that he did, it is far from clear that much weight should be given to his purported agreement. In April 2007, Tietgen had not seen Fickler in over a year. And when he was asked in December 2007 about his purported agreement, Tietgen flatly contradicted the opinion, stating that there was "no way Fickler had sustainable work capacity at a light level" and there was "no way she was capable of working." T523. And unlike Jarzynka's report, the basis for this opinion was in the record: it was based on Tietgen's October 2007 examination. T285, 523, 526.

The ALJ should not have relied upon the Unum letter, at least not without seeking further clarification. The ALJ apparently considered each of Tietgen's opinions, but only relied upon the functional limitations set forth in the Unum letter. The problem is not that the ALJ may have discredited Tietgen's other opinions—he is able to do so *if* warranted by the record. *McCadney v. Astrue*, 519 F.3d 764, 767 (8th Cir. 2008). The problem is that it is unclear whether he *did* discount Tietgen's other opinions, and if so, why. *Id.* Without further evidence regarding the basis of the Unum letter, relying upon it was error, and if the Unum letter drops out of the equation, the Court cannot determine whether it is likely the ALJ would have assigned more weight to Tietgen's other opinions.

This case resembles *Vossen v. Astrue*, 612 F.3d 1011 (8th Cir. 2010). In *Vossen*, the ALJ credited the opinion of a non-examining medical expert over a consulting physician who had examined the claimant, because the ALJ questioned the authenticity of the consultant's report. *Id.* at 1016–17. The Eighth Circuit held that the ALJ erred in not contacting the examining physician to clear up any questions of authenticity. *Id.* As the *Vossen* court explained:

> The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC. . . . As previously noted, "[t]he opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." Certainly, there are circumstances in which relying on a non-treating physician's opinion is proper. But here, the primary reason for doing so was the suspected inauthenticity of [the examining physician's] assessment of [the claimant's] sitting and standing limitations. This assessment went to the crucial issue of [the claimant's] RFC.

*Id.* (citations omitted). It was the ALJ's duty, on remand, to determine if the examining physician's report was authentic, and if so, to weigh that opinion against the other evidence and reexamine the claimant's RFC as necessary. *Id.* at 1016–17.

Here, the ALJ relied on an opinion that lacked any basis in the record. The ALJ was not obliged to give the Unum letter any weight; but if he chose to do so, the ALJ needed to determine what, if any, basis there was for the opinion it contained. As in *Vossen*, Tietgen's opinions went to the crucial issue of Fickler's RFC, and in particular, her ability to sit, stand, and walk. This error is significant, because if the Unum letter is disregarded, there is little other evidence on this point. And in particular, there is little evidence on what effect Fickler's fibromyalgia—which the ALJ found was a severe impairment, and which everyone agreed caused some measure of pain and fatigue—had on her ability to work.

Only Tietgen and the consulting physicians addressed the *effects* of Fickler's fibromyalgia. In 2005, Hurley diagnosed Fickler with fibromyalgia, but did not detail any specific limitations this imposed on her ability to work. T269–70. He only opined that she would have difficulty performing her previous job at Tyson. T270. In 2010, Wik agreed with the diagnosis of fibromyalgia, but offered no specific limitations. T1244–45. It is not clear if either doctor was asked to express an opinion on the matter; and in that case, the absence of such an opinion does not constitute substantial evidence supporting an ALJ's findings. *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001).

That leaves Birch, who examined Fickler only once. His examination focused almost exclusively on Fickler's lymphedema and carpal tunnel syndrome. T367–75. Although he was asked to consider her fibromyalgia, the only evidence that he did so is a single mention at the beginning of his report, that Fickler alleged she suffered from the condition. T372. The remainder of his examination focused on her lymphedema, assessing her range of motion and the effects of her carpal tunnel syndrome, and performing various tests for neurological deficits. T373–75.

The Court cannot determine whether Birch considered Fickler's fibromyalgia at all. His report contains no discussion of fibromyalgia, of testing for trigger points, or of speaking with her about her symptoms. Little can be gleaned from the fact that Fickler's range of motion and other musculoskeletal and neurological examinations were essentially normal. That is generally the case with fibromyalgia patients. *Johnson v. Astrue*, 597 F.3d 409, 410 (1st Cir. 2009) (citing Dennis L. Kasper, et al., *Harrison's Principles of Internal Medicine* 2056 (16th ed. 2005)). But the failure to address Fickler's subjective complaints is troubling, because these are "'an

essential diagnostic tool'" in cases of fibromyalgia. *Id.* at 412 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003)).

So, the only medical evidence that actually addressed the limitations imposed by Fickler's fibromyalgia consisted of Tietgen's reports, especially those from May 2006 and October 2007, and the opinions of the consulting physicians. As the Court discusses below, the opinions of the consulting physicians generally supported the RFC arrived at by the ALJ. But Tietgen, who actually examined Fickler and was the only person to have examined her on multiple occasions, stated that Fickler could only perform 2–3 hours of "sedentary" activity each day (which involved, among other things, walking and standing "on occasion") and 1–2 hours of "light activity" each day (which required standing 6–8 hours a day). T526, 528. This is significantly less than the ALJ's finding that Fickler could stand and walk for 6–8 hours each day, even when factoring in the ALJ's sit/stand option. It is not entirely clear how long Tietgen believed Fickler could *sit* each day, but the limit of 2–3 hours of sedentary activity suggests that he also believed she would not be capable of sitting for 6 hours, as found by the ALJ.

If the ALJ had credited Tietgen's assessments, it may have led to the conclusion that Fickler was disabled. The ALJ found that Fickler had the capacity to do "light work," with several modifications. Light work is defined as requiring, among other things, "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). "Sedentary work," in turn, involves sitting, with only occasional walking and standing. § 404.1567(a). If Tietgen's assessments were correct, Fickler would have had difficulty doing either sedentary or light work for a full 8-hour day.

While the ALJ considers all relevant evidence in formulating the claimant's RFC, *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005), the determination is in part a medical question, so the ALJ's assessment "must be supported by *some* medical evidence of the claimant's ability to function in the workplace." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (emphasis supplied). The medical evidence concerning Fickler's fibromyalgia was quite limited, and so omission of Tietgen's reports stands out. In cases of fibromyalgia, "where a claimant's RFC depends in large part on the functional implications of his or her *subjective* symptoms, a treating physician's 'on-the-spot examination and observation of [the] claimant'" is important. *Johnson*, 597 F.3d at 413. While Tietgen was a physician's assistant, rather than a physician, his training, experience, and actual examinations of Fickler provided key evidence that should have been carefully considered.

The Court acknowledges that Fickler bore the burden to prove disability and demonstrate her RFC. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012). While she produced a voluminous set of medical records, many were not particularly helpful. But it was the ALJ's duty to develop the record and ultimately make the RFC determination. *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011). The ALJ may, or may not, have considered and disregarded Tietgen's other reports. But as already noted, the problem is not that the ALJ may, or may not, have disregarded Tietgen's other reports, the problem is the Court cannot tell if he did, or if so, why.

The ALJ has the duty, in the first instance, to weigh the evidence and resolve conflicts among the opinions of various medical sources. *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012); *Masterson v. Barnhart*, 363 F.3d 731, 736 (8th Cir. 2004). And "it is not for the court to assign weight to evidence that was not properly considered by the ALJ." *O'Connor v. Barnhart*, 2004 WL 2192730, *4 (N.D. Iowa 2004). Doing so would invade the ALJ's statutorily appointed role as the fact-finder. *Id.* at *5–7. After making the appropriate findings of facts, the ALJ must also "minimally articulate his reasons for crediting or rejecting evidence of disability." *Ingram*, 107 F.3d at 601. Stated another way, the ALJ must build a "logical bridge between the evidence and [his] conclusion." *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011). Here, some pieces of the bridge are missing.

In light of the record before it, the Court cannot say that the error was harmless, i.e., that the ALJ would inevitably have reached the same result if he had properly considered all of Tietgen's reports. *Dewey v. Astrue*, 509 F.3d 447 (8th Cir. 2007); *cf. Ford v. Astrue*, 518 F.3d 979, 982–83 (8th Cir. 2008) (even where ALJ's credibility finding was supported by substantial evidence, remand was required because the court could not say whether the ALJ "would necessarily have disbelieved [the claimant] absent the erroneous inferences that he drew from the record").

The Court's decision is not altered by the fact that Tietgen was a physician's assistant, and therefore not what Social Security regulations refer to as an "acceptable medical source." Social Security regulations distinguish between "acceptable medical sources," and "other sources" which include medical and non-medical sources. *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007); 20 C.F.R. § 404.1502. Acceptable medical sources include, among other things, licensed physicians and licensed or certified psychologists. *Sloan*, 499 F.3d at 888; § 404.1513(a). As to "other sources," medical sources include, *inter alia*, physician assistants and nurse practitioners, and non-medical sources include welfare agency personnel, friends, neighbors, and family. *Sloan*, 499 F.3d at 888; § 404.1513(d).

While "other sources" cannot establish the existence of a medically determinable impairment, they may "'provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.'" *Id.* (quoting SSR 06-03p). In SSR 06-03p, the Social Security Administration acknowledged that other sources were playing an increasing role in treating and evaluating claimants. *Id.* Opinions from these sources are "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* These opinions should be evaluated using the same factors used to evaluate opinions from acceptable medical sources, set forth in 20 C.F.R. § 404.1527(d). SSR 06-03p. But while these factors are useful, they are not binding on the ALJ, who has greater discretion in dealing with opinions from "other sources." *Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006); *cf. Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

That said, in some cases, after weighing the appropriate factors,

> an opinion from a medical source who is not an "acceptable medical source" <u>may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source</u>. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

SSR 06-03p (emphasis supplied).

Tietgen was the only medical professional who saw Fickler for her fibromyalgia on more than one occasion, and was in the best position to evaluate its effects on Fickler. SSR 06-03p does not itself require any particular level of explanation by an ALJ, and there "is a distinction between what an adjudicator must <u>consider</u> and what the adjudicator must <u>explain</u> in the disability determination or decision." SSR 06-03p (emphasis supplied). However, the ALJ "generally should explain the weight given to opinions from these 'other sources.'" *Id.* And as discussed above, the ALJ has an overarching duty to build a logical bridge between the evidence and his findings. *Cf., Richardson v. Astrue*, 858 F. Supp. 2d 1162 (D. Colo. 2012) (ALJ erred in failing to properly weigh opinion of nurse practitioner using factors set forth in SSR 06-03p); *Hernandez v. Astrue*, 814 F. Supp. 2d 168, 183 (E.D.N.Y. 2011) (although ALJ may properly afford no weight to opinion of "other source," the ALJ must explain that decision).

The ALJ should have either disregarded the Unum letter or conducted further investigation to discover the basis for the opinion it contained. If the Unum letter had been disregarded, the ALJ may have assessed the opinions of Tietgen, Reed, and Bane differently. As it was, it is not clear that the RFC fully encapsulated all limitations imposed by Fickler's conditions, including her fibromyalgia and lymphedema. That may, in turn, have affected the ALJ's evaluation of Fickler's credibility. In sum, considering the Unum letter without ascertaining the basis for the opinions it contained was prejudicial error requiring remand.

### IV. The ALJ's Duty to Obtain Additional Medical Evidence

Fickler next argues that the ALJ did not fulfill his duty to fully and fairly develop the record, because he failed to ensure "that the record include[d] evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue." Filing 17 at 21. Fickler's brief does not specify which impairment she is referring to. The most likely candidates are fibromyalgia and lymphedema. But there was evidence from Birch and the consultants regarding Fickler's lymphedema. T374–75, 383–86, 391. So, the Court understands Fickler to be arguing that it was the ALJ's obligation to ensure the record contained an opinion from a treating or examining physician regarding any limitations imposed by her fibromyalgia. As discussed above, the only evidence on this subject was provided by Tietgen and the non-examining consultants.

The ALJ's duty to develop the record "may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped." *Smith v. Barnhart,* 435 F.3d 926, 930 (8th Cir. 2006). Generally, the opinions of doctors who have not examined the claimant do not constitute substantial evidence on the record as a whole. *Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir. 2000). This is especially true when the opinion of the non-examining doctor conflicts with the evaluation of a treating physician. *Wagner v. Astrue,* 499 F.3d 842, 849 (8th Cir. 2007).

However, substantial evidence will support an ALJ's determination where the ALJ does not rely solely on the opinions of non-examining physicians, but also conducts an independent review of the medical evidence, as well as other evidence in the record, such as a lack of treatment and the claimant's activities of daily living. *Krogmeier v. Barnhart,* 294 F.3d 1019, 1023–24 (8th Cir. 2002); *cf. Vossen,* 612 F.3d at 1016. Here, it is possible that the ALJ might have been able to properly determine Fickler's RFC without additional medical evidence.

Because this case is being remanded, it would be premature to decide whether the ALJ would be required to seek out additional medical evidence,

should the Commissioner determine that further proceedings are necessary. The Court cannot determine whether the evidence in support of any conclusion is sufficient without first knowing the conclusion. *See Goff v. Barnhart,* 421 F.3d 785, 791 (8th Cir. 2005). If, however, the ALJ finds during any further proceedings that there is not sufficient evidence of how fibromyalgia affects Fickler's ability to work, he may address the matter by, for example, ordering a consultative examination that actually addresses her fibromyalgia. *See*, *Lauer v. Apfel*, 245 F.3d 700, 706 (8th Cir. 2001); 20 C.F.R. § 404.1519a(b).

## V. Explaining the Decision Not to Credit the Opinions of the State Agency Medical Consultants

Fickler next argues that the ALJ erred in failing to explain the weight he gave to the opinions of Drs. Reed and Bane, the non-examining physicians who provided physical RFC assessments in 2009. *See* T382–391. The ALJ gave these opinions "some weight," noting that neither physician examined Fickler, but that their opinions were consistent with his own RFC assessment and the record as a whole. T19. Fickler claims that the failure to further explain the weight given to these opinions was error, because Reed and Bane both found that Fickler could only stand and walk for 2 hours out of an 8-hour work day, while the ALJ found Fickler could stand and walk for 6 hours, with a sit/stand option.

However, Fickler has misconstrued the findings of Reed and Bane. Reed did find (and Bane reaffirmed) that Fickler could stand and walk for at least 2 hours each day; but further found that she could also stand and walk for up to 3 to 5 hours each day. *See* T383, 391. And that assessment is not inconsistent with the ALJ's determination of Fickler's RFC. The ALJ found that Fickler could stand and walk for 6 hours, with a sit/stand option. Reed and Bane, on the other hand, did not check the box stating that Fickler "must periodically alternate sitting and standing to relieve pain or discomfort." *See* T383. The ALJ found that Fickler could do slightly more than Reed or Bane found, but only with an additional accommodation. A claimant's RFC measures the most a claimant can still do in a work setting. *Gonzales*, 465 F.3d at 894 n.3 (quoting 20 C.F.R. §§ 404.1545 and 416.945). The ALJ could have explained this aspect of his decision more thoroughly, but Fickler has not shown that this has prejudiced her.

## VI. Evaluation of Fickler's Credibility

Fickler also argues that the ALJ failed to properly apply the factors to be considered in evaluating her credibility. Filing 18 at 8. As noted above, in assessing a claimant's credibility, the ALJ should consider: (1) the claimant's

daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Moore*, 572 F.3d at 524. Not every factor will apply in every case, and the ALJ need not explicitly discuss each one. *Id.* It is sufficient if he acknowledges and considers the factors before discounting the claimant's subjective complaints.

The credibility of a claimant's subjective testimony is primarily for the ALJ to decide. *Vossen*, 612 F.3d at 1017. The ALJ's credibility determination must be upheld if the ALJ provides good reasons for discounting the claimant's subjective complaints—i.e., inconsistencies in the record, or the *Polaski* factors—and those reasons are supported by substantial evidence. *Gonzales,* 465 F.3d at 895–96. Here, the ALJ found that Fickler's complaints of disabling symptoms were not entirely credible, and supported his determination with cogent reasons that were supported by substantial evidence. Accordingly, his determination should be upheld.

Fickler argues that the ALJ failed to properly consider the effects of her obesity. That was not the case. The ALJ found that Fickler's obesity exacerbated her other impairments, and considered it throughout his analysis. T16–18. Primarily, the ALJ focused on Fickler's failure to follow Tietgen's advice. T17–19. On numerous occasions, Tietgen recommended that Fickler exercise, lose weight, and eat right. T273–77. He told her that this was part of the treatment for fibromyalgia. T276. But the record contains no evidence that Fickler attempted to follow this advice. Failing to follow a recommended course of treatment weighs against a claimant's credibility. *Wagner,* 499 F.3d at 851.

Fickler quotes *Stone v. Harris*, 657 F.2d 210, 212 (8th Cir. 1981), for the proposition that "[t]he notion that all fat people are self-indulgent souls who eat more than anyone ought appears to be no more than the baseless prejudice of the intolerant svelte." And she argues, weight loss is difficult even for the "iron-willed" and further complicated by the fact that exercise was difficult due to pain. Filing 17 at 26. While the Court has no disagreement with these generalities, Fickler has not demonstrated their specific application to her case. The ALJ's analysis reveals no prejudice, but instead shows a careful consideration of Fickler's condition, as well as the fact that she had generally failed to follow Tietgen's advice.

The Court has considered Fickler's other arguments with respect to the ALJ's credibility determination and finds each of the arguments to be without merit. The ALJ's credibility determination was supported by fair reasoning and substantial evidence. But should the Commissioner decide that further

proceedings are warranted after remand, the ALJ is free to revisit some of the credibility determinations, if merited, based on the reasons for remand in this case.

## VII. Evaluation of the Third-Party Statements

Finally, Fickler argues that the ALJ failed to properly evaluate the statements from her friends and family. However, these statements generally were cumulative to Fickler's own testimony. They confirmed that she had limited daily activities, and that she dealt with pain and fatigue. There were some minor inconsistencies between Fickler's reports of her daily activities and those provided by the third parties, which the ALJ may have taken out of context. But that aside, Fickler has not shown that the ALJ improperly considered or weighed the opinions. This last argument is without merit.

## CONCLUSION

The Court finds that, while many of Fickler's asserted errors are without merit, two require remand. For the reasons stated, this is not a case where the medical evidence "overwhelmingly supports a finding of disability," so remand (rather than awarding benefits) is the appropriate remedy. *Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009). Accordingly,

IT IS ORDERED:

1.    This case is reversed and remanded to the Commissioner for further proceedings consistent with this opinion; and

2.    A separate judgment will be entered.

Dated this 15th day of March, 2013.

BY THE COURT:

John M. Gerrard
United States District Judge